291 P.2d 890

**CONTINENTAL BANK AND TRUST COMPANY, a corporation, Plaintiff and Respondent,**

**v.**

**R. W. STEWART, Defendant and Appellant.**

No. 8378.

Supreme Court of Utah.

Dec. 30, 1955.

J. Grant Iverson, Salt Lake City, for appellant.

Harold G. Christensen, Allen M. Swan, Salt Lake City, for respondent.

CROCKETT, Justice.

Plaintiff bank recovered judgment against defendant, R. W. Stewart, under the theory that the bank was a third-party beneficiary to receive part of the purchase money Mr. Stewart had contracted to pay for the farm of A. W. Cheney. Stewart appeals.

An earnest money receipt dated November 30, 1953, by which Stewart agreed to

purchase Cheney's farm located in Davis County forms the basis of the transaction in question. It recited that the total price was to be $23,647.80, which was to be paid by Mr. Stewart's assuming and paying debts which Mr. Cheney owed to banks, and to pay the balance of $6,000 in cash.

The document did not state just what debts, nor the time or manner of payment to be made. In the blank space provided for that purpose in the form was inserted:

"Arrangements to pay banks in the amounts set forth amounting to $17,-647.80, also $6,000.00 payable to Ace Cheney, which is the total of the purchase price as above."

It is undisputed that, at the time, the debts Mr. Cheney owed to banks were these:

(1) $5,280.17 to Barnes Banking Co., secured by a first mortgage on the property;

(2) $6,106.77 to Barnes Banking Co., secured by a second mortgage on the property;

(3) $4,120.00 to Valley State Bank on note purchased from Barnes Bank. Barnes Bank took mortgage on cows and the property.

(4) $2,200.00 to Valley State Bank, secured by mortgage on cows; and

(5) $6,280.00 to Continental Bank and Trust Co., unsecured notes.

In accordance with the terms of the agreement that "banks" be paid, Mr. Stewart proceeded to pay items (1), (2), and (3) above. It is significant to note that they were all secured by mortgages on the property, and that they total $15,506.94, which is $2,140.86 less than the amount Stewart had agreed to pay on such obligations.

Meanwhile, Continental Bank sued Mr. Cheney on the notes it held (item (5) above) for $6,280. So far as disclosed, Mr. Cheney made no claim that Stewart had agreed to assume and pay this obligation until after judgment was taken against him and he was brought into court on a supplemental proceeding. At that time he testified to such fact. Upon the basis of his testimony, Continental Bank initiated this action against Stewart, claiming as a third-party beneficiary of Cheney's rights as seller under the sale agreement.

■ The trial court was undoubtedly correct in allowing recovery on the basis of the plaintiff's rights as a third-party beneficiary.[1] A question of more critical importance arises as to the correctness of the amount of recovery allowed. This involves a determination as to whether the debt of Mr. Cheney to the plaintiff, Continental Bank (item (5) above) was *necessarily* included in the debts which Mr. Stewart agreed to assume and pay, or could Mr. Stewart pay *any* such debts so long as they aggregated the total of $17,647.80.

As noted above, the agreement itself was uncertain in that it did not specify

1. Assets Realization Co. v. Cardon, 72 Utah 597, 272 P. 204.

which of Cheney's debts were to be paid, and the matter is further confused because no combination of said debts will result in the $17,647.80 set forth in the agreement.

■■ In view of the lack of definiteness in the terms of the contract, it was proper for the court to receive extraneous evidence as to its meaning.[2] It is true that the express terms of an agreement may not be abrogated, nullified or modified by parol testimony; but where, because of vagueness or uncertainty in the language used, the intent of the parties is in question, the court may consider the situation of the parties, the facts and circumstances surrounding the making of the contract, the purpose of its execution, and the respective claims thereunder, to ascertain what the parties intended.[3]

Consistent with the rule just stated, the trial court received other evidence bearing on the intent of the parties. The testimony of Mr. Cheney and Mr. Stewart were diametrically opposed to each other. Mr. Cheney, the only witness presented by the bank, testified that the obligation to the Continental Bank was definitely discussed and that Mr. Stewart stated:

"We will personally take care of that and see that that is paid."

Mr. Stewart testified to the contrary: That no such statement was made and that his agreement was only to pay loans *secured by mortgages* on the property. Additional evidence was adduced which will be adverted to later.

The trial court held in favor of the plaintiff and in accordance with Mr. Cheney's testimony. Plaintiff insists that the judgment is, therefore, supported by substantial evidence and that under the cardinal rule of appellate review it cannot be disturbed.[4] In support of that contention plaintiff calls attention to the fact that Mr. Stewart's testimony was halting and evasive to the extent that the trial court felt it necessary to admonish him on a number of occasions, as contrasted with Mr. Cheney's testimony which plaintiff contends was forthright and unshaken on cross-examination, and which the trial court believed.

■ While it is true that the testimony of a witness such as Mr. Cheney would ordinarily be regarded as sufficient to compel the affirmance of the trial court's finding, that is not necessarily so under all circumstances. Defendant is correct in arguing that even though the testimony

2. Columbia Gas Const. Co. v. Holbrook, 6 Cir., 81 F.2d 417; Latta v. Da Roza, 100 Cal.App. 606, 280 P. 711, 281 P. 655.

3. American Bonding Co. v. Pueblo Investment Co., 8 Cir., 150 F. 17, 9 L.R.A., N.S., 557; Salt Lake City v. Smith, 8 Cir., 104 F. 457; Sternberg v. Drainage Dist. No. 17, 8 Cir., 44 F.2d 560.

4. If there is any substantial evidence supporting the finding, it will not be disturbed. Martindale v. Oregon Short Line R. Co., 48 Utah 464, 160 P. 275, 277. Malstrom v. Consolidated Theatres, Utah, 290 P.2d 689. See Seybold v. Union Pac. R. Co., Utah, 239 P.2d 174, 177.

standing alone might be sufficient to support a finding, it must always be appraised in the light of all the attendant circumstances and countervailing testimony. If when so viewed, it appears so clearly and palpably unreasonable that no fact trier acting fairly and reasonably could accept it, then it must be rejected as a matter of law, and the fact determined otherwise.[5] This is particularly so here where Mr. Cheney had such a vital personal interest in the controversy, since it obviously would be greatly to his advantage if he could fix upon Mr. Stewart the responsibility of paying this large unsecured personal debt.

If we set aside for the moment the testimony of the two principals, Mr. Cheney and Mr. Stewart, as offsetting each other because of their self interest, and make an analysis of the facts and circumstances of the transaction, the purpose the parties were seeking to accomplish, and the independent testimony in the case, grave doubt arises as to the accuracy of Mr. Cheney's story, and Mr. Stewart's version becomes much more reasonable in comparison. In addition to the failure of Cheney to claim that Stewart had assumed the obligation until he was brought in on supplemental proceeding, there are several matters which definitely support the version of the transaction claimed by Stewart.

The first of these is the fact that Mr. Marl O. Bell, the real estate agent involved in the sale, and who does not appear to have any reason for bias for or against either of the principals, testified that his recollection was that the obligation to the Continental Bank was not included in the debts Stewart was to pay. This, in spite of the fact that the debts were discussed in his presence and that Mr. Cheney furnished him "slips of paper" showing what obligations he owed, and that it was from these that the witness arrived at the sum of $17-647.80 as the total. On being questioned about the nature of the debts, he referred to them as "liens on the property."

A further aspect of the transaction which argues in favor of the contention of Mr. Stewart arises out of an analysis of the figures themselves and the equities between the parties. Mr. Stewart having, in compliance with the terms of the agreement to pay Cheney's debts "to banks," paid items (1), (2) and (3) aggregating $15,506.94, left him owing a balance of only $2,140.86. To now require him to pay in full the obligation of $6,280 to the Continental Bank would mean that he would pay a total of $27,786.94 or $4,139.14 more than the contract price, the inequity of which is obvious. The plaintiff bank argues, however, that such result comes about through Stewart's own fault in that it says that he paid item (3), the $4,120 note to the Valley State Bank as a volunteer because he was not obligated to pay it, but that he had expressly

5. See 9 Wigmore on Evidence, 3rd Ed., Sec. 2494; and Seybold v. Union Pac. R. Co., supra.

agreed orally that the debt to the Continental Bank would be paid.

In support of the proposition that the debt to the Valley State Bank was paid as a volunteer, plaintiff avers that while this obligation was originally secured by a mortgage, it became an unsecured loan when Barnes Bank assigned it to Valley State, since the mortgage was not assigned with the note. Whether this be so may depend upon the wording of the documents and the nature of the transaction. We deem it unnecessary and immaterial to go into the matter, because the contention of the plaintiff is untenable anyway. It cannot be disputed that the latter debt was, at least in the first instance, a secured loan, and that Mr. Stewart could reasonably have regarded it as such. In paying it he was in literal compliance with the terms of the agreement which only required that he "pay banks" to which Cheney owed money. Inasmuch as he paid such debt in accordance with the agreement he should be entitled to full credit therefor.

▮ To require Mr. Stewart to pay the additional $4,139.14 would run counter to what we regard to be a salutary rule applicable to the interpretation of contracts where uncertainty exists, that: "The court will endeavor to give the contract a rational and just construction." [6] This rule is echoed in apt language by Mr. Page in his Treatise on Contracts:

"As between two constructions, each probable, one of which makes the contract fair and reasonable and the other of which makes it unfair and unreasonable, the former should always be preferred." [7]

Another circumstance persuasive of Mr. Stewart's position is that within three days after the execution of the original contract, the parties in a supplemental contract in this same deal, characterized the debts Stewart was to assume as *secured loans*. By this agreement Mr. Stewart was to transfer a piece of property in Texas to Cheney in lieu of the $6,000 cash provided for in the sale contract; it contained a recital of the terms of the sale of the farm in these words:

"That whereas, Asahel W. Cheney and Robert W. Stewart have heretofore executed an agreement for the sale and purchase of a farm in Kaysville together with the personal property located thereon and Robert W. Stewart has agreed to pay therefor the sum of $6,000.00 and *assume all obligations secured by liens or mortgages upon the real property, * * *.*" (Emphasis ours.)

The above emphasized language, used by the parties near the time of, and in connection with the original transaction, has an important bearing on what their then intent was, both in the words used and

---

6. Parsons on Contracts, Vol. 2 (9th Ed.) page 494.

7. 2 Page on Contracts, Sec. 1121.

because it is entirely in accord with the purpose to be accomplished. It is a great deal more probable that Stewart would agree to pay secured loans, as he claims, to protect the title to the property he was buying than to pay an unsecured loan of $6,280 to the Continental Bank, which was the personal obligation of Mr. Cheney, without a "scratch of the pen" to definitely so indicate.

 It thus appears to us that the facts and circumstances attendant upon the transaction combine to point plainly to the reasonableness and accuracy of Mr. Stewart's version of the transaction and run contrary to that of Mr. Cheney. The latter's testimony, burdened with the frailty of self-interest, which frailty is enhanced by an overlong delayed disclosure of his claim that Stewart assumed the obligation, presents such a picture that when his evidence is subjected to critical analysis against the background of the various considerations hereinabove discussed, it appears so entirely improbable, and would be so unfair and unjust in forming a foundation upon which to fasten upon Mr. Stewart the burden of an additional $4,139.14 beyond the price called for in his contract of purchase, that it must be rejected.[8]

As to the rights of the Continental Bank under the agreement, the law is well settled that the rights of a third person to sue on a contract made for his benefit depend on the terms of the agreement and are not greater than those of the promisee.[9] Therefore, even though Cheney insists that Stewart should pay the full obligation, the plaintiff bank is in no better position than Cheney would have been if he were the instigator of this action. This being the case, the maximum that Cheney could recover would be the $2,140.86, subject to interest adjustment, that remains unpaid. This amount is also the limit of the plaintiff's right to recover here. The judgment is modified by reducing it to such amount.

Affirmed as so modified. Costs to appellant.

McDONOUGH, C. J., and HENRIOD, J., concur.

WORTHEN, J., concurs in the result.

WADE, Justice (concurring in the result).

I concur in the result. However, I am not prepared to hold that the trial court's finding to the effect that the defendant Stewart promised Cheney that he would pay this obligation to the plaintiff bank is unreasonable in view of the evidence, but I think a correct construction of this contract, even though we assume that this finding is correct and binding on us, requires a reduction of the amount of the judgment as held in the prevailing opinion.

By the earnest money agreement, Stewart agreed to purchase Cheney's farm "for

---

8. See footnote 5, supra.

9. 17 C.J.S., Contracts, § 519, p. 1137.

the purchase price of 23,647.80 Dollars," and that the balance of the purchase price shall be paid by "arrangements to pay banks the amount set forth amounting to $17,647.80 also $6,000.00 payable to Ace Cheney which is the total of the purchase price as above." At the bottom of the earnest money agreement there is a paragraph which is signed by both Stewart and Cheney in which they "agree to carry out and fulfill the terms and conditions above specified, the Seller agrees to furnish an abstract of title continued to date, or a policy of title insurance, showing a good marketable title, * * *".

It is elementary that the plaintiff bank as a third-party beneficiary of this agreement between Stewart and Cheney cannot recover from Stewart on this account unless Cheney, had he brought the suit, could have recovered from Stewart. For the bank is not an innocent purchaser for value without notice nor is there any estoppel in its favor. In fact, there is no consideration for this contract from the bank. All of the consideration for Stewart's promise was from Cheney. Under such circumstances any defense which Stewart would have against Cheney is a good defense against the bank. Our problem is to determine whether Cheney could have enforced this agreement against Stewart. From the following considerations I think it is clear that he could not.

The terms of the contract are entirely indefinite as to the different items of indebtedness which Stewart agreed to pay banks but the total amount of such debts was clearly and definitely fixed and limited to $17,647.80. It is also undisputed that Cheney owed the various banks the five items listed in the prevailing opinion. The total amount of such items was far in excess of the $17,647.80 which Stewart agreed to pay to banks. It is also undisputed that the first three items listed in the prevailing opinion were secured by mortgages which were of record against the property which Stewart purchased, thus constituting a cloud on the marketability of Cheney's title. It is obvious therefore, and this fact is confirmed by evidence, that the important reason for this provision in the contract that Stewart would pay the banks' claims was to enable Stewart to pay these recorded liens and thereby clear his title to the property and at the same time have such payments apply as a part of the purchase price. This also had the effect of enabling him to clear the title to the property and pay the purchase price without exposing him to the danger that if he made the purchase price payments direct to Cheney, the liens might not be paid and he might be compelled to pay them twice. Such being the case, Stewart had a right as a matter of law to pay the first three items and thereby clear the title to the property even though he had orally agreed with Cheney that he would pay to the bank this debt here sued on, for the whole instrument clearly shows that such was the intention of the parties in making this contract. Certainly no one intended that Stewart was to pay the banks more than $17,647.80 or that when he was through paying that amount there

236

would remain a cloud on the marketability of the title to the property in the form of a recorded mortgage against it.

Some argument is made that since item (3) had been assigned without assigning the mortgage which secured it, such mortgage was thereby released and was not a lien against the property. Although I disagree with the result suggested that such assignment of the note without assigning the mortgage would release the lien, assuming that it would, I think it immaterial, for the recorded mortgage was still there rendering the title to the property unmarketable. There is no claim that Cheney ever claimed he could or offered to clear this cloud from the title without this note being paid by Stewart. I therefore concur in the result.